UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Ayana Simmons,

    Plaintiff,

—v—

The United States Of America,

    Defendant.

17-cv-1058 (AJN)

MEMORANDUM
OPINION AND ORDER

ALISON J. NATHAN, District Judge:

In this tragic case arising under the Federal Tort Claims Act ("FTCA"), the Plaintiff alleges that the United States negligently caused the death of Idrissa Camara, a security guard who was shot while on duty by a former employee of the U.S. Department of Labor. The Government moves to dismiss the action, arguing first that the Court does not have jurisdiction to decide the case because the United States has not waived its sovereign immunity under these circumstances, and second that the Plaintiff has failed to state a claim upon which relief can be granted. The Court concludes that it does not have subject-matter jurisdiction to decide the case, and thus the motion to dismiss is granted.

I.    **Background**

For the purposes of deciding this motion to dismiss, the Court accepts as true the facts alleged in the complaint. *Port Wash. Teachers' Ass'n v. Bd. of Educ.*, 478 F.3d 494, 498 (2d Cir. 2007). According to the complaint, Idrissa Camara was a security guard employed by FJC Security Services, Inc. ("FJC") who was shot and killed on August 21, 2015 while working at a federal office building located at 201 Varick Street. Complaint, Dkt. No. 1, ¶¶ 3-5.

The complaint alleges that Mr. Camara was shot by an individual named Kevin Downing,

1

who had been appointed as an economist to the New York Office of the U.S. Department of Labor ("DOL") Bureau of Labor Statistics in January 1999. Complaint ¶ 21. According to the complaint, between February 1999 and October 1999, Downing contacted members of Congress to alert them that the DOL's plan to consolidate regional New York and Boston offices violated the law and constituted a gross mismanagement of funds. Complaint ¶ 21. Downing was fired from the DOL on November 29, 1999. Complaint ¶ 22. The complaint alleges that the termination "took place during the one-year trial period of [Downing's] employment, and the stated reason was 'significantly less than satisfactory' work performance and conduct." Complaint ¶ 22. Downing allegedly contested his termination as a violation of the Whistleblower Protection Act. Complaint ¶ 23. The Merit Systems Protection Board ultimately dismissed his claim based on an alleged finding that Downing had not made any disclosures warranting protection under the Whistleblower Protection Act. Complaint ¶ 23. In 2006, the Federal Circuit Court of Appeals affirmed that dismissal. Complaint ¶ 23.

According to the complaint, Downing "continued to aggressively and publicly contest his termination" for years after the final adjudication of his case in 2006. Complaint ¶ 24. Among his actions, the complaint alleges that he:

> (1) solicited the National Taxpayers Union (a group that protests wasteful government spending) to write about his case; (2) started a petition on change.org recounting his claims and requesting reinstatement with the USDOL and damages; (3) contacted his local congressional office for assistance; and (4) persistently called various news media outlets to report on his case, including the Bergen Record.

Complaint ¶ 24. The complaint further alleges that Downing "became increasingly frustrated and angry with" the DOL and "began to make specific and repeated threats of violence against [it], including its employees working at 201 Varick Street." Complaint ¶ 25.

In response to Downing's specific threats of violence, the complaint alleges, the DOL

and/or the Government Services Administration ("GSA") "requested that FJC create and staff an extra, additional security post" directly outside of the DOL's office on the eighth floor of 201 Varick Street. Complaint ¶ 27. FJC did post a full-time security guard outside of the DOL's office. Complaint ¶ 28. However, according to the complaint, neither the DOL nor the GSA ever notified Mr. Camara or any other lobby security guard of Mr. Downing's threats to commit violence against DOL employees at 201 Varick Street. Complaint ¶ 29. Similarly, neither the DOL nor the GSA provided Mr. Camara "with any photo or description of Mr. Downing, or in any way indicate that Mr. Camara should be on alert for him." Complaint ¶ 30. Importantly for present purposes, the complaint does not allege, however, that the DOL and GSA failed to warn FJC about the threat Mr. Downing posed. In fact, the complaint alleges instead that the DOL and the GSA failed to "direct[] FJC to warn Mr. Camara about Mr. Downing, or to take any additional precautions to ensure [Mr. Camara's] safety." Complaint ¶ 31. It also alleges that "in response to the known threat that Mr. Downing [posed], an FJC-employed security guard was posted, full time, outside USDOL's office on the 8th floor of 201 Varick Street, in the vicinity of Room 878." Complaint ¶ 28.

On August 21, 2015 at approximately 5:00 p.m., Mr. Camara was working as a security guard in the lobby of 201 Varick Street when Mr. Downing entered the building with a bag of guns. Complaint ¶¶ 33-34. Mr. Camara was armed and in uniform. Complaint ¶ 35. As Mr. Downing approached the security checkpoint at which Mr. Camara was stationed, he pulled a gun out of his bag and shot Mr. Camara at close range in the face. Complaint ¶ 36. After shooting Mr. Camara, Mr. Downing walked through the building's metal detectors to the building's elevator where he shot himself in the head. Complaint ¶ 37. Mr. Camara was rushed to Lenox Hill HealthPlex where he was pronounced dead at 5:55 p.m. on August 21, 2015.

Complaint ¶ 38.

Mr. Camara's wife, Ayana Simmons, was appointed Administratix of his estate by the Surrogate's Court of the State of New York, New York County, on October 20, 2015. Complaint ¶ 42. On June 7, 2016, Ms. Simmons served upon the DOL a claim including a Standard Form 95 and exhibits. Complaint ¶ 43. On August 16, 2016, Claims Counsel for the DOL confirmed receipt of Ms. Simmons's claim. Complaint ¶ 43. On December 7, 2016, Claims Counsel informed Ms. Simmons that her claim was still being investigated. Complaint ¶ 44.

On February 13, 2017, Ms. Simmons filed the complaint in this action against the United States of America alleging that it negligently failed to warn Mr. Camara of the specific threat posed by Mr. Downing. *See* Complaint. On June 27, 2017, the United States filed a motion to dismiss arguing that the Court lacks subject-matter jurisdiction over this action and that the complaint fails to state a claim upon which relief can be granted. *See* MTD, Dkt. No. 11; Memo. in Support of MTD ("Support"), Dkt. No. 12.

## II. Motion to Dismiss Under Rule 12(b)(1)

The United States first moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. The Court concludes that it does not have subject-matter jurisdiction over the case, and therefore grants the motion to dismiss.

### A. Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A plaintiff asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." *Id.* "[J]urisdiction

4

must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)). A court considering a motion to dismiss based on lack of subject-matter jurisdiction "may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (second alteration in original) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). As a result, the United States's "waiver of sovereign immunity is a prerequisite to subject-matter jurisdiction." *Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 139 (2d Cir. 1999). Waivers of sovereign immunity must be strictly construed in favor of the government. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685-86 (1983).

One such waiver of sovereign immunity is the FTCA, which provides a waiver of sovereign immunity for

> claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). However, the FTCA excepts from this waiver

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

5

*Id.* § 2680(a). This exception, known as the "discretionary function exception," "operates as a significant limitation on [the FTCA's] waiver of immunity." *Mejia v. United States*, No. 13-cv-5676 (AJN), 2015 WL 5138708, at *4 (S.D.N.Y. Sept. 1, 2015). The discretionary function exception reflects Congress's "desire to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

To determine whether the discretionary function exception applies, courts employ the so-called *Berkovitz-Gaubert* test. Under the *Berkovitz-Gaubert* test, the discretionary function exception applies "only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). Where the discretionary function applies, subject matter jurisdiction does not exist. *See id.*

**B.    Discussion**

The Court concludes that the Plaintiff has not met her burden of demonstrating by a preponderance of the evidence that the discretionary function exception does not apply. In particular, the Court concludes that the Defendant exercised discretion when it warned FJC about the threat Mr. Downing posed rather than warning each individual security guard employed by

FJC. That decision was susceptible to policy analysis under step two of the *Berkowitz-Gaubert* test.[1] *See Coulthurst*, 214 F.3d at 109.

As alleged in the complaint, the Government informed FJC of the threat posed by Mr. Downing but did not individually inform each FJC-employed security guard of the threat. *See* Complaint ¶¶ 28-31. That decision was susceptible to policy analysis because DOL and GSA officials had to balance competing interests, including "budgetary constraints," "agency priorities," "the need to protect the building and tenants from identified risks," and "the appropriate level of public access to the building." Decl. of Stephan M. Anest Jr., Dkt. No. 13, ¶¶ 4-5. Based on such policy considerations, Government employees used discretion in determining that it was most efficient and effective to inform FJC about the risk posed by Mr. Downing and trust FJC to pass that information along to individual security guards rather than task one or more Government employees at 201 Varick Street with individually warning each new security guard who arrived for a shift. This use of discretion was particularly justified because the Government "does not manage the day-to-day activities or the physical performance of the [Government-FJC] contract by FJC employees." Anest Decl. ¶ 7. The Government's decision was discretionary because it "require[d] judgment as to which of a range of permissible courses [was] the wisest." *Gaubert*, 499 U.S. at 325. Such security decisions have regularly been held to satisfy the discretionary function exception by federal courts. *See, e.g., Sigman v. United States*, 217 F.3d 785, 797 (9th Cir. 2000) (holding that decision not to warn employees of air force base about a mentally ill soldier's release "brought into play sensitive and competing policy considerations of protecting safety while preserving resources"); *Macharia v. United*

---

[1] Both parties acknowledge that the Defendant's actions in this case satisfy step one of the *Berkowitz-Gaubert* test because no statute or regulation compelled the Defendant not to warn individual security guards about a former employee making threats against Government workers. *See* Support at 8-9; Opp. at 6-7.

*States*, 334 F.3d 61, 66-67 (D.C. Cir. 2003) (affirming district court decision that "[d]ecisions regarding how much safety equipment should be provided to a particular embassy, how much training should be given to guards and embassy employees, and the amount of security-related guidance that should be provided necessarily entails balancing competing demands for funds and resources" (alteration in original) (citation omitted)); *Pudeler v. United States*, No. 09-cv-1543 (JGM), 2013 WL 6511937, at *7 (D. Conn. Dec. 12, 2013) ("'It is not this court's role to second guess the layout of TSA security checkpoints, nor is it within the purview of this court to determine' the process by which passengers pass through the magnetometer, nor should the court 'determine the appropriate personnel allocation throughout a security checkpoint area.'" (citation omitted)).

The Court concludes that Government employees exercised discretion when they decided to warn Mr. Camara's employer, FJC, about the threat posed by Mr. Downing rather than warn each individual security guard who worked at 201 Varick Street. Such a decision required the efficient balancing of Government resources with the need to protect individuals who worked at that location. As a result, the Court concludes that the Government's action is covered by the discretionary function exception, and that this Court therefore does not have subject-matter jurisdiction to decide the case. The motion to dismiss under Rule 12(b)(1) therefore must be granted.

The Plaintiff argues in response, first, that although the Government's decision in this case was susceptible to policy analysis, it was not "based on public policy." Memo. in Opp. to MTD ("Opp."), Dkt. No. 17, at 6-7. In effect, the Plaintiff argues that the Government's decision here was "careless" rather than considered, and that as a result, the discretionary function exception does not apply. Opp. at 7. The Court finds this characterization of the

8

Government's action unpersuasive. The Plaintiff has not established that the Government's decision to warn FJC rather than every individual security guard was "careless" or not based in public policy. As a result, the Plaintiff's reliance on *Andrulonis v. United States*, 952 F.2d 652 (2d Cir. 1991), is misplaced. In *Andrulonis*, the Second Circuit held that there could be no possible policy rationale for a Government-employed supervisor's failure to warn an employee of dangerous laboratory conditions before the employee conducted experiments with the rabies virus. *Id.* at 654-55. In the present case, however, Government supervisors *did* appropriately warn security guards about the threat posed by Mr. Downing by warning their employer, FJC. The Plaintiff in this case is thus not claiming that the Government failed to give *any* warning, but rather whether the means of warning that the Government chose was sufficient. That decision is clearly subject to policy analysis and thus falls within the discretionary function exception.

The Plaintiff argues, second, that the discretionary function exception "does not apply at all where the Government was negligent in its role as a premises owner and landlord." Opp. at 12. In support of this argument, the Plaintiff cites a single case from the Fifth Circuit Court of Appeals holding that where the Government makes the type of decisions "with which any private landowner would be concerned," the discretionary function exception does not apply. *Gibson v. United States*, 809 F.3d 807, 813 (5th Cir. 2016); *see also* Opp. at 12-13. The *Gibson* opinion is not binding on this Court, and the weight of authority – including cases within this district – supports the contrary conclusion. *See, e.g., Brotman v. United States*, 111 F. Supp. 2d 418, 425-27 (S.D.N.Y. 2000) (collecting cases and holding that the discretionary function exception applies when the Government acts in its capacity as landlord). As a result, the Court declines to reach the novel conclusion that the Government is not entitled to sovereign immunity when its agents exercise discretion in a Government-owned building.

## IV. Conclusion

The motion to dismiss is granted. This resolves Docket Number 11. The Clerk of Court is ordered to close this case and issue judgment.

SO ORDERED.

Dated: March ___, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge